In re Andres **HERNANDEZ** and Dorothy Hernandez, Debtors.

No. 99–01192–YUM–EWH.

United States Bankruptcy Court, D. Arizona.

Sept. 9, 2002.

John A. Weil, Esq., Law Office of John A. Weil, Yuma, AZ, for Debtors.

Riley C. Walter, Esq., Gregory S. Powell, Esq., Walter Law Group, Fresno, CA, Jeffery R. Gilles, Esq., Paul W. Moncrief, Esq., Lombardo & Gilles, PLC, Salinas, CA, for Great Northern Equipment Company.

## MEMORANDUM DECISION

EILEEN W. HOLLOWELL,
Bankruptcy Judge.

The court must decide if Debtor Andres Hernandez (Hernandez) may assume an executory contract which is the most important asset of the Debtors' estate. For the reasons set forth below the court finds that the contract is not assumable.

### FACTS AND PROCEDURAL HISTORY

Hernandez was a principal, along with Steven Wolfe, Andrew Smith, and John Hougham in Global Prepcorp, a corporation based in Salinas, California, which was involved in the agricultural business. With John Hougham (now deceased) as lead inventor, these men developed a pro-

cess for processing leafy vegetables that resulted in extended storage life. The application for a patent (the Patent) on the process was filed with the Patent and Trademark Office in November, 1991. The Patent was granted in 1994 to John Hougham as the inventor, and he assigned the Patent to Global Prepcorp. That same year, Global Prepcorp granted a non-exclusive, non-transferable license to use the Patent to Tanimura 7 Antle, Inc., a large distributor of vegetables and vegetable products, also based in Salinas, California.

In 1997, as part of the mediated dissolution of Global Prepcorp, the Patent was distributed to John Hougham. Shortly thereafter, John Hougham sold the Patent to its current owner Great Northern Equipment Company (Great Northern/Licensor). As part of the mediated dissolution of Global Prepcorp, Hernandez, Steven Wolfe, and Andrew Smith (collectively the "Licensees") were each given an identical "exclusive" license ("License") to the Patent evidenced by a written license agreement dated July 17, 1997 (the Agreement). Under the Agreement, each of the Licensees was granted the right to use the Patent to produce products within the United States and Mexico for worldwide sale. The term of the License runs until July 17, 2010, a few months short of the end of the term of the Patent. The rights granted by the Agreement include a right to "sublicense" the License to assist the Licensees in the production and distribution of products made using the Patent. Paragraph 2 of the Agreement prohibits assignment of the License to "any third party". The Licensees are, however, permitted to assign the License to a wholly owned subsidiary or an entity that is under a Licensee's control. Control is defined as "control of fifty-one percent [51%] or more of the equity and voting power" of the assignee.

During the first five years of the Agreement, the Licensor was precluded from issuing any new licenses. Beginning in July, 2002, the Licensor could issue no more than two additional licenses per year. Under paragraph 4 of the Agreement the Licensor must establish and administer a litigation fund (Fund) "for the purpose of defending the Patent from infringement or third party patent claims of any nature." The Licensor and the Licensees are each required to contribute to the Fund.

In 1998, Hernandez entered into a subcontracting agreement (Subcontracting Agreement) with Fresh Leaf Farms LLC (FLF) (formerly Costa Mann Produce Company) to provide services, including the production, shipment and sale of vegetables, using the Patent. Under the Subcontracting Agreement, the vegetables processed are sold under Hernandez's labels and marketing programs. FLF has invested substantial sums of money to perform its obligations under the Subcontracting Agreement and has filed an affidavit in this case estimating its rejection damages, in the event Hernandez cannot assume the License, as being in excess of $1.7 Million.

In November of 1999, involuntary petitions under Chapter 11 were filed against Hernandez, his wife and Hernandez's wholly owned corporation, Salad Fix'ns, Ltd. An order for relief in all three cases was entered in January 2000. Subsequently, the Salad Fix'ns case was converted to Chapter 7. Hernandez and his wife's consolidated cases have proceeded by fits and starts. The primary obstacle faced by the Debtors to confirmation of their Plan of Reorganization, filed in February of 2001 (and subsequently modified several times), has been the objections raised by the Licensor and Steven Wolfe (Objectors).[1] Both the Objectors are actively

---

**1.** Steven Wolfe and his related entities (collectively "Monterey Leaf Creditors") is another

using the Patent and are therefore in direct competition with Hernandez's use of the Patent. Despite repeated efforts to settle, including a formal mediation, the Debtors have been unable to resolve their dispute with the Objectors which revolve around Hernandez's right to assume the License and whether the Subcontract Agreement with FLF violates the terms of the Agreement.

On June 14, 2002, the court heard argument on the assumption issue and issued a tentative ruling that the Agreement was an exclusive license and that, therefore, the holding of the 9th Circuit in *In re Catapult Entertainment, Inc.*, 165 F.3d 747 (9th Cir.1999) which bars the assumption of nonexclusive patent licenses was not necessarily dispositive in this case. The court then requested supplemental briefs from the parties on the applicability of 11 U.S.C. § 365(c)(1) to the Agreement in light of the court's tentative ruling. The parties have filed their briefs and the matter is now ready for decision.

## *JURISDICTION*

The court has jurisdiction in this matter pursuant to 28 U.S.C. § 1334(a) and § 157(a) and (b).

## *DISCUSSION*

The parties do not dispute the fact that the Agreement is an executory contract and that § 365 of the Code governs Hernandez's right to assume the Agreement. Under § 365(a), debtors in possession are generally permitted to assume or reject any executory contract. Section 365(f)(1) permits a debtor in possession to assign his executory contracts, notwithstanding prohibitions on assignment contained in the contract or in applicable law. Howev-

er, a debtor's right to assume under § 365(a) or to assign under § 365(f)(1) may be subject to the requirements of § 365(c). Section 365(c)(1) sets forth a "carefully crafted" exception to § 365(f)(1) to prohibit assignment of an executory contract in those circumstances where "applicable law" prohibits assignment based on the materiality of the identity of the contracting party.[2] *In re Catapult*, 165 F.3d at 752 (adopting the holding of the 6th Circuit in *In re Magness*, 972 F.2d 689, 698 (6th Cir.1992)). Under *Catapult*, the § 365(c)(1) exception applies in cases where a patent license is nonexclusive. 165 F.3d, at 750. The court must therefore determine if § 365(c)(1) applies to this case if the court follows its tentative ruling that the License is exclusive.

### A. Even if the License is Exclusive, § 365(c)(1) Governs Assumption

The parties have expended a great deal of time arguing and briefing the question of whether the License is exclusive or nonexclusive. This is understandable since a determination that the License is nonexclusive would put this case squarely within the holding of *Catapult*. The 9th Circuit, however, limited its holding in *Catapult* to nonexclusive patent licenses: "[a]ccordingly, we express no opinion regarding the assignability of *exclusive* patent licenses under federal law." 165 F.3d at 751 n. 3 (emphasis in the original).

 Notwithstanding the Objectors' strenuous arguments that the License is nonexclusive, the court finds, as stated in its tentative ruling on June 14, 2002, that the License is some "version of an exclusive license." The court bases its finding on the fact that the Agreement gives Her-

---

**2.** All of the parties in this case agree that the applicable law regarding assignment of the Agreement is federal patent law.

nandez rights which go beyond the rights granted in a nonexclusive patent license. A nonexclusive license simply grants the licensee the privilege of being protected from an infringement claim by the licensor. *See Ortho Pharm. Corp. v. Genetics, Inst., Inc.,* 52 F.3d 1026 (Fed.Cir. 1995); and *Sanofi v. Med–Tech Veterinarian Prod. Inc.,* 565 F.Supp. 931, 936 (D.N.J.1983).

In this case, the Agreement prohibits the Licensor from granting additional licenses for a period of five years. After the five-year moratorium, the Agreement restricts the number of additional licenses which can be granted by the Licensor to two per year for the balance of the thirteen-year term of the Agreement. The Agreement requires the creation of the Fund for the purpose of defending the Patent from infringement. The Licensees, as well as the Licensor, are required to contribute to the Fund making it clear that defense of the Patent is for the benefit of the Licensees as well as the Licensor. Accordingly, the Agreement grants Hernandez something beyond the mere right not to be sued for infringement. It grants him the right to have the Patent defended from infringement and the right to have the Patent licensed to a limited number of licensees for the term of the Agreement. Are such additional rights sufficient to make the License freely assignable under Federal patent law?

■ The Debtors claim that the grant of an exclusive license creates an equitable ownership interest that is freely assignable under federal patent law. The court does not agree. Federal patent law recognizes three ways in which a patent may be transferred:

(1) transfer of the whole patent;

(2) transfer of an undivided part of the patent; or

(3) an exclusive .territorial grant to use the patent in a defined region of the United States.

*Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891). Anything else is a license. *Id.*

■ Patent holders have broad discretion in granting licenses and courts have recognized that the rights granted to an exclusive licensee may vest the licensee with an equitable proprietary interest in protecting a patent from infringement. *See Philadelphia Brief Case Co. v. Specialty Leather Prod. Co., Inc.,* 145 F.Supp. 425, 430 (D.N.J.1956). However, the recognition that an exclusive licensee has a sufficient property interest to give her standing to sue to protect her licensed patent from infringement, does not mean she can freely assign her exclusive license. The reason that the holder of an exclusive license's equitable property interest may not be freely assignable is based on the nature of rights granted under the Patent Act. As the court noted in *In re Supernatural Foods, LLC,* 268 B.R. 759, 802 (Bankr.M.D.La.2001):

> The right to use, make, or sell one's own invention does not stem from the Patent Act. What is granted by a patent is the right to exclude others from using one's invention; thus the language of the statute, 'Every patent shall contain ... a grant to the patentee ... of the *right to exclude others,* from making, using or selling the invention ....

To adopt the Debtors' interpretation of assignability of an exclusive license would create a situation where a patent holder loses control over the identity of its license holders whenever the license agreement provides a licensee with an exclusive right. Such a result, which effectively treats the grant of an exclusive license as the equivalent of an outright assignment of the Patent, is inconsistent with federal case law

which carefully distinguishes between the two. *See e.g., Waterman,* 138 U.S. at 255, 11 S.Ct. 334; *Pope Mfg. Co. v. Gormully & Jeffery Mfg. Co.,* 144 U.S. 248, 12 S.Ct. 641, 36 L.Ed. 423 (1892); *Etherington v. Hardee,* 290 F.2d 28 (5th Cir.1961). ·

■ The court, therefore, finds that applicable federal patent law would require the consent of the Licensor to assign the License in this case even if the License is exclusive. Accordingly, § 365(c)(1) applies the "carefully crafted" exception to Hernandez's efforts to assume the License.[3]

### B. The License is not Assignable under the Hypothetical Test

■ In *Catapult,* the court adopted the so called "hypothetical" test to determine if a debtor in possession can assign an executory contract. 165 F.3d at 750. Under the hypothetical test, "[a] debtor in possession may not assume an executory contract over the non-debtor's objection if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has no intention of assigning the contract in question to such a third party." *Id.*

■ The Debtors argue that because Paragraph 2 of the Agreement permits Hernandez to assign the License to a corporation in which he retains a 51% ownership interest he can satisfy the hypothetical test. However a corporation which is 51% controlled by Hernandez does not qualify as a third party. Black's Law Dictionary defines a third party as being "someone other than the principal parties." *Black's Law Dictionary* 1489 (7th ed., West 1999). Transferring ownership of the License from Hernandez to an entity

which he controls is merely a change in form, not identity. In order to prevail under the hypothetical test, the Debtors must be able to demonstrate that federal patent law would require the Licensor to accept performance from, and render performance to, a party different from Hernandez. *Catapult,* 165 F.3d at 752 (citing *In re James Cable,* 27 F.3d 534, 538 (11th Cir.1994)). The Debtors cannot meet the hypothetical test because a Hernandez controlled entity is not different from Hernandez.

The fact that Hernandez cannot satisfy the hypothetical test for assignment of the License does not, however, end the court's inquiry. Even if the general rule of federal common law prohibits assignment of the License the restriction on assignment is, nevertheless, subject to consent. Therefore, the court must determine if under the Agreement, the Licensor pre-consented to an assignment of the License in such a way as to make § 365(c)(1) inapplicable.

### C. The Pre–Consent in the Agreement Does Not Make § 365(c)(1) Inapplicable

■ Hernandez asserts that because Paragraph 2 of the Agreement includes the prior consent by the Licensor to an assignment of the License to an entity he controls, that he can demonstrate that he can assign and, therefore, assume the License. The court agrees that nothing in federal patent law prevents the assignment of a license where there are "express words to show an intent to extend the right to an assignee." *Supernatural Foods,* 268 B.R. at 804–805 (quoting *Oliver v. Rumford Chemical Works,* 109 U.S. 75, at 81–82, 3 S.Ct. 61, 27 L.Ed. 862 (1883)).

---

**3.** The court notes that under the *Catapult* and *Magness* interpretation of § 365(c)(1), the exception effectively swallows the "broader" rule of § 365(f)(1) because every law of general application which prohibits or restricts transfers and assignments makes the identity of the parties to a contract material. *Supernatural Foods,* 268 B.R. at 781.

As stated by the court in *Supernatural Foods:* "§ 365(c)(1) is not applicable to prohibit assignment, if the parties have opted out of generally applicable law prohibiting assignment, as long as the contractual assignability is enforceable under applicable non-bankruptcy law." *Id.* at 805.

■ The problem in this case, however, is that unlike the situation in *Supernatural Foods* or the other cases cited by the Debtors (*Cyrix Corp. v. Intel Corp.*, 803 F.Supp. 1200 (E.D.Tex.1992); *In re Midway Airlines, Inc.*, 6 F.3d 492 (7th Cir. 1993)), the Licensor has not pre-consented to an assignment to anyone other than Hernandez. In the cases cited by the Debtors, assignment *without regard to the identity of the assignees* was permitted in situations involving a sale of substantially all of the assets (*Supernatural Foods, Cyrix*) or to a trustee in bankruptcy (*Midway Airlines*). In consenting to assignment in such situations, the non-debtor parties to the contracts gave up any interest in the identity of the assignees, thereby effectively removing the contracts from the protections otherwise afforded to them under "applicable law" and § 365(c)(1), to control the identity of assignees.

In this case, the Licensor's consent to assignment of the License is limited to an entity wholly-owned or controlled by Hernandez. There is, therefore, no indication that in pre-consenting to assignment the Licensor waived its rights under federal patent law to control the identity of its licensees.

The court has struggled with the result which the holding in *Catapult* imposes in this case. It is at least counter intuitive to suggest, as the Objectors do, that within the legal structure imposed by §§ 365(a), (f) and (c), a debtor may never enforce his rights under his pre-petition executory contract. At first (and even second) blush, such a result seems absurd. After all, if Hernandez assigns the License under Paragraph 2 of the Agreement to an entity he controls, the Licensor's rights to control its licensees are unaffected——the License remains controlled by Hernandez which is exactly what the Licensee consented to in the Agreement. All of the public policy reasons for protecting a patent licensor's rights to control the identity of its licensees, as set forth in the cases cited by the Objectors are satisfied if Hernandez is permitted to enforce Paragraph 2 of the Agreement, thereby demonstrating that the License is assumable because it is assignable. However, a finding that the pre-consent to assignment of Paragraph 2 of the Agreement effectively removes assignment of the License from the requirements of § 365(c)(1) thereby making § 365(f)(1) applicable to any assignment of the License. Under § 365(f)(1) Hernandez could assign the License to anyone notwithstanding the restrictions in Paragraph 2 of the Agreement:

> Once it is determined that applicable law does not excuse performance or acceptance of performance, the contract is viewed through the lens of § 365(f)(1) which clears the field of any purported restriction on the trustee's right to assign. If there is no enforceable applicable law prohibiting assignment or examining the acceptance of performance, § 365(f)(1) controls the enforceability of transfer restrictions, *and nullifies them.*

*Supernatural Foods* 268 B.R. at 806 (emphasis added).

Furthermore, if § 365(c)(1) does not apply, then the Licensor does not have the right recognized in *Catapult*, after Hernandez assumes the License to consent or withhold consent at the time (if ever) that Hernandez seeks to assign the License in the future. 165 F.3d at 752. Such a result would be inconsistent with applicable fed-

eral patent law unless the pre-consent given by the Licensor indicates that the identity of the assignee was immaterial. Those are not the facts in this case. In this case the pre-consent of Paragraph 2 of the Agreement makes the identity of the assignee material. Therefore, the requirements of § 365(c)(1) must be met for Hernandez to assume the License.

## CONCLUSION

The court recognizes that Great Northern, as both the Licensor and a competitor of Hernandez, has strong self interest reasons for not consenting to Hernandez's assumption of the License. However, nothing in the Bankruptcy process prohibits a non-debtor party from pursuing its own self interest. The pre-consent to assignment in Paragraph 2 of the Agreement is not broad enough to take the assignment out of the requirements of § 365(c)(1). Given the holding of *Catapult*, the court has no discretion to apply anything other than the hypothetical test to determine if the License can be assumed by Hernandez and Hernandez cannot meet that test. Accordingly the License is not assumable. The court has not found any case which directly addresses the question of whether a non-assumable executory contract can simply "ride through" the bankruptcy *if* the other party to the contract objects or files a motion to require the Debtor in possession to assume or reject the contract. The parties are directed to file concurrent supplemental briefs within thirty days on the question of whether a Debtor must, on the request of the other party to the contract, reject a non-assumable contract.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Bankr.R. Proc. 9021. A separate order consistent with the terms of this Memorandum Decision will be issued this date.